904 So.2d 400 (2005)
Terrell M. JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1042.
Supreme Court of Florida.
April 28, 2005.
Rehearing Denied June 10, 2005.
*401 Neal A. Depree, Captial Collateral Regional Counsel and William M. Hennis, III, Litigation Director, CCRC-South, Fort Lauderdale, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Kenneth S. Nunnelley, *402 Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Terrell M. Johnson, a prisoner under sentence of death, appeals an order of the circuit court denying his second successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution. For the reasons that follow, we affirm. We hold that (I) the trial court did not abuse its discretion in summarily denying the defendant's public records claim or in concluding that all but one of the public records the State did not disclose to the defendant are either exempt from disclosure or not relevant; (II) the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not apply retroactively in Florida; and (III) execution by lethal injection is constitutional.

PROCEDURAL BACKGROUND
In December 1979, Johnson shot and killed two people  a bartender and a customer  at an Orange County tavern. He was convicted of first-degree murder of the bartender and second-degree murder of the customer. On the first-degree conviction, the jury recommended, and the trial court imposed, a sentence of death. Johnson appealed the conviction and sentence to this Court, but the trial transcript was so incomprehensible that we relinquished jurisdiction for reconstruction of the record and an evidentiary hearing to determine its accuracy. After receiving a supplemental transcript, we affirmed the conviction and sentence. See Johnson v. State, 442 So.2d 193 (Fla.1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984).
Johnson filed his first motion for postconviction relief in 1985. The circuit court held an evidentiary hearing and eventually denied the motion. We affirmed. Johnson v. State, 593 So.2d 206 (Fla.), cert. denied, 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). In 1995, Johnson filed a petition for a writ of habeas corpus in this Court. We found every issue either procedurally barred or lacking merit. See Johnson v. Singletary, 695 So.2d 263 (Fla. 1996). In 1997, Johnson filed a second motion for postconviction relief. The circuit court denied all relief without an evidentiary hearing. Again, we affirmed. Johnson v. State, 804 So.2d 1218 (Fla. 2001).
In 2002, Johnson filed a third postconviction motion. The motion, as consolidated and amended, raised four claims.[1] After inspecting sealed documents in response to Claim I, the circuit court summarily denied relief. Johnson then moved for rehearing, which the court granted in part. The court again inspected the sealed documents and, "in an abundance of caution," released one document that referred to "a fugitive with a criminal history who uses as an alias the name of one of the jurors in [Johnson's] trial." The court maintained its denial of *403 relief without an evidentiary hearing. Johnson now appeals the summary denial of his third postconviction motion to this Court. We address each claim in turn.

I. PUBLIC RECORDS CLAIM
Johnson first alleges that his due process and equal protection rights were violated because the Florida Department of Law Enforcement (FDLE) and the Ninth Circuit State Attorney's Office withheld public records relevant to his case. He presented this claim as one of "newly discovered evidence." The documents at issue were filed with the state records repository in March and April 2001. Some were sealed; others were not. The unsealed documents mention six people who have the same names as jurors in Johnson's case: Linda Stewart, William Young, Peggy Smith, Gregory Simmons, Fred Cooper, and Betty Phillips. These names appear in various criminal investigation and intelligence documents. As to the sealed records, FDLE asserted several statutory exemptions from disclosure of public records concerning criminal investigations and confidential informants.
Johnson obtained copies of the unsealed records shortly after becoming aware of them. At the time, Johnson's appeal of his first successive postconviction motion was pending in this Court, and oral argument already had been held. Johnson filed a motion to relinquish jurisdiction for consideration of the new documents. We denied the motion without prejudice to file a motion in the circuit court. Johnson subsequently filed the motion at issue in this case, requesting an evidentiary hearing on his public records claim. He also asked the circuit court to inspect the documents in camera pursuant to Florida Rule of Criminal Procedure 3.852(f).
After inspecting the sealed documents in camera, the circuit court summarily denied relief. The court concluded that "Defendant's claims are merely conclusory" and that "all documents not yet disclosed to Defendant are either exempt from disclosure or not relevant." Johnson moved for a rehearing, which the court granted in part. After again inspecting the sealed documents in camera, the court stated in a March 2003 order:
The Court finds that a valid exemption exists for each of the allegedly exempt documents. Moreover, for all but one document, the contents are clearly irrelevant to any possible Rule 3.851 proceeding. The sole exception is ... an FDLE investigative report. The report refers to a fugitive with a criminal history who uses as an alias the name of one of the jurors in Defendants trial. While the Court notes that any connection between the fugitive and the actual juror is purely speculative, that investigative report is the only exempt document which the Court cannot definitively find to be irrelevant. Therefore, in an abundance of caution, the Court shall release copies of that single document to the parties.
The court maintained its denial of relief and refused to grant an evidentiary hearing.
Johnson now argues the court should have granted an evidentiary hearing. A defendant is entitled to an evidentiary hearing on his postconviction motion unless (1) the motion, files and records in the case conclusively show that the defendant is not entitled to any relief, or (2) the motion or a particular claim is legally insufficient. See Maharaj v. State, 684 So.2d 726, 728 (Fla.1996); Holland v. State, 503 So.2d 1250, 1251 (Fla.1987). In determining whether an evidentiary hearing is warranted, we must accept the defendant's factual allegations to the extent they are not refuted by the record. See *404 Peede v. State, 748 So.2d 253, 257 (Fla. 1999). However, we have "rejected the argument that an evidentiary hearing is required to resolve every postconviction motion that alleges a public records violation. The defendant must support his motion... with specific factual allegations." Thompson v. State, 759 So.2d 650, 659 (Fla.2000) (citation omitted) (citing Downs v. State, 740 So.2d 506, 510-11 (Fla.1999)). Conclusory allegations do not justify an evidentiary hearing. See Kennedy v. State, 547 So.2d 912, 913 (Fla.1989).
We agree with the trial court that Johnson's public records claim is legally insufficient as a "newly discovered evidence" claim. We repeatedly have held that "[i]n order to obtain relief on a claim of newly discovered evidence, a claimant must show, first, that the newly discovered evidence was unknown to the defendant or defendant's counsel at the time of trial and could not have been discovered through due diligence and, second, that the evidence is of such a character that it would probably produce an acquittal on retrial." Mills v. State, 786 So.2d 547, 549 (Fla. 2001) (citing Jones v. State, 709 So.2d 512 (Fla.1998)). Johnson has not explained how the unsealed records FDLE and the State Attorney's Office released "would probably produce an acquittal on retrial." In fact, we are confident they would not. The unsealed records date back only to 1988, whereas voir dire in Johnson's case was conducted in 1980. Thus, even if the records concern criminal activity by the jurors in Johnson's case  which at this point is sheer speculation  they still would be irrelevant.
Apparently recognizing that the unsealed documents do not contain any information likely to lead to a retrial, much less an acquittal, Johnson alleges that FDLE may be withholding additional relevant documents. Despite the State's representation to the circuit court that "we have a one-time occurrence here," Johnson claims that the tardy production of public records in early 2001 "calls into question the record keeping practices of the FDLE in regards to Mr. Johnson's case" and may indicate that more unproduced documents exist. Far from being a "specific factual allegation[]" as required by Thompson, 759 So.2d at 659, this allegation amounts to a "fishing expedition for records." Moore v. State, 820 So.2d 199, 204 (Fla.2002) (rejecting a public records claim because "importantly, [the defendant] has made no showing that there is any additional information that has not been disclosed").
We consistently have upheld the summary denial of public records claims based on a defendant's mere speculation about the existence of unproduced records. For example, in Downs v. State, 740 So.2d at 510, the defendant alleged that a law enforcement agency had withheld notes from witness interviews, whereas the State and the sheriff's office claimed that all relevant records had been disclosed. Id. Because the defendant "did not proffer or assert the existence of any evidence that such notes existed and were improperly being withheld," we affirmed the denial of relief. Id. at 511; cf. Mendyk v. State, 707 So.2d 320, 322 (Fla.1997) ("In the absence of a showing that ... notes or recording may have been made [by a sheriff's department], the trial judge did not abuse his discretion in denying Mendyk's motion...."); Mills v. State, 684 So.2d 801, 806 (Fla.1996) ("We find no abuse of discretion in the trial court's failure to order the production of records [from a sheriff's department] when there is no demonstration that the records exist."). Like the defendant in Downs, Johnson has failed to allege the existence of specific additional, undisclosed public records. The mere fact that FDLE belatedly released some records *405 in this case does not justify an evidentiary hearing regarding additional records in the absence of specific allegations that such records exist.
The trial court also followed the appropriate procedure in evaluating the sealed records. In Ragsdale v. State, 720 So.2d 203 (Fla.1998), we held that where doubt exists as to whether the State must disclose allegedly exempt documents, the trial court should first review the documents in camera. Id. at 206; see also State v. Kokal, 562 So.2d 324, 327 (Fla.1990). If the trial court decides that a document is not exempt, the State must release it to the defense. Ragsdale, 720 So.2d at 206. The trial court's decision is subject to an abuse of discretion standard. See Mills, 786 So.2d at 552. Discretion is abused only when the trial court's decision is "arbitrary, fanciful, or unreasonable." White v. State, 817 So.2d 799, 806 (Fla.2002) (citing Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000)).
The record does not indicate that the trial court acted arbitrarily, fancifully, or unreasonably in withholding all but one of the sealed documents after reviewing them twice. To the contrary, in an abundance of caution it released the only document even potentially relevant. Although some of the sealed documents do mention individuals with the same names as some of the jurors in Johnson's case, none of them dates back to 1980 or appears in any way helpful to Johnson. The sealed documents, like the unsealed ones, have absolutely no bearing on Johnson's case. We therefore conclude that the trial court did not abuse its discretion in refusing to grant an evidentiary hearing on Johnson's public records claim or in withholding all but one of the sealed documents after twice reviewing them in camera.

II. RETROACTIVITY OF RING

For a defendant to be sentenced to death in Florida, the judge must find sufficient aggravating circumstances to warrant the death penalty. See § 775.082, Fla. Stat. (2004); § 921.141, Fla. Stat. (2004). Johnson, whose jury recommended death by a vote of seven to five, received a death sentence after his trial judge found four aggravating factors.[2] Johnson now argues that his death sentence is unconstitutional in light of the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that a jury, not a judge, must find every fact upon which eligibility for the death penalty depends. We conclude, however, that Johnson may not invoke Ring. Applying the retroactivity analysis we announced in Witt v. State, 387 So.2d 922, 925 (Fla.1980), we hold that Ring does not apply retroactively in Florida to defendants whose convictions already were final when that decision was rendered.

A. Ring and Our Response
We begin by summarizing Ring and our response to it. In June 2002, the United States Supreme Court held in Ring that a jury, not a judge, must find beyond a reasonable doubt every fact necessary to expose a defendant to a sentence of death. 536 U.S. at 589, 122 S.Ct. 2428. Ring was not a sudden or unforeseeable development in constitutional law; rather, it was "an evolutionary refinement in capital jurisprudence." Monlyn v. State, 894 So.2d *406 832, 841 (Fla.2004) (Pariente, C.J., specially concurring). The Supreme Court merely applied the reasoning of another case, Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death penalty cases. In Apprendi, the Court had announced that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348. Although Apprendi had excluded death penalty cases from its holding, id. at 497, 120 S.Ct. 2348, the Court concluded two years later in Ring that "[c]apital defendants, no less than noncapital defendants... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589, 122 S.Ct. 2428.
Ring not only invalidated the judicial finding of aggravating factors in Arizona, id. at 609, 122 S.Ct. 2428, but also cast doubt upon the constitutionality of the death penalty laws of many other states, including Florida, where judges are partially or entirely responsible for deciding whether to sentence defendants to death. See id. at 608, 122 S.Ct. 2428 (stating that Florida has a "hybrid system" of capital sentencing, involving both judge and jury). Those states must now determine whether Ring requires minor or even major adjustments to their capital sentencing schemes.
We first analyzed Ring's effect on Florida law in two plurality opinions, Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). Both opinions noted that the United States Supreme Court repeatedly has upheld Florida's capital sentencing scheme. Bottoson, 833 So.2d at 695; King, 831 So.2d at 143. They also cited that Court's admonition that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [other court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), quoted in Bottoson, 833 So.2d at 695, and King, 831 So.2d at 143. Neither Bottoson nor King, however, garnered a majority. In fact, Chief Justice Pariente later recognized that "we have not yet as a Court determined whether Ring has any applicability to Florida's death penalty scheme or if so, whether any aspect of that holding would be retroactive to cases already final." See Allen v. State, 854 So.2d 1255, 1263 (Fla.2003) (Pariente, J., specially concurring).
As a result of this lack of consensus, virtually every postconviction appeal filed in this Court since Ring invokes that case. We repeatedly have denied such requests for clear lack of merit, while reserving judgment on whether Ring even affects Florida law or applies retroactively to postconviction cases. Usually the Ring claims have failed because the sentence was supported by an aggravating factor found by a jury beyond a reasonable doubt, such as a prior violent felony conviction or a contemporaneous enumerated felony conviction. See, e.g., Kimbrough v. State, 886 So.2d 965 (Fla.2004); Pietri v. State, 885 So.2d 245 (Fla.2004); Sochor v. State, 883 So.2d 766 (Fla.2004). We could easily dispose of Johnson's Ring claim in the same way because his death sentence was supported by an aggravating factor found by a jury beyond a reasonable doubt  namely, his prior convictions of two violent felonies. Johnson, 442 So.2d at 197.
*407 We choose to use this opportunity, however, to answer one of the underlying questions on which we have previously reserved judgment: whether Ring applies retroactively in Florida to defendants, such as Johnson, whose convictions already were final at the time of that decision. Only in concurring opinions has this issue been discussed at length. See, e.g., Windom v. State, 886 So.2d 915, 935 (Fla.2004) (Cantero, J., specially concurring) (concluding that Ring should not apply retroactively in Florida); Bottoson v. Moore, 833 So.2d 693, 717 (Fla.2002) (Shaw, J., concurring in result only) (concluding that Ring should apply retroactively in Florida). Yet in our recent decision in Monlyn, a majority consensus began to emerge. Two concurring opinions, joined by a total of five justices, expressed the view that Ring is not retroactive in Florida. Chief Justice Pariente, joined by Justice Quince, concluded that Ring "does not apply retroactively to cases on postconviction review under the test of Witt." Monlyn, 894 So.2d at 841. Justice Cantero, joined by Justices Wells and Bell, agreed that under the Witt test Ring does not apply retroactively, but urged that, in determining the retroactivity of cases emanating from the United States Supreme Court, this Court abandon Witt in favor of the more recent test announced in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Id. at 840. Using the analysis articulated in Witt, we now hold that Ring does not apply retroactively in Florida.

B. Overview of Retroactivity Analysis
It is clear that new law announced by this Court or the United States Supreme Court applies to all non-final criminal cases  that is, to all cases involving convictions for which an appellate court mandate has not yet issued. See Smith v. State, 598 So.2d 1063, 1066 (Fla.1992) (holding that "any decision of this Court announcing a new rule of law ... must be given retrospective application by the courts of this state in every case pending on direct review or not yet final"), limited by Wuornos v. State, 644 So.2d 1000, 1008 n. 4 (Fla.1994) (reading Smith "to mean that new points of law established by this Court shall be deemed retrospective with respect to all non-final cases unless this Court says otherwise").
Whether newly announced rules of law apply to cases that already were final at the time of the announcement is a different question. We have recognized that once a conviction has been upheld on appeal, the State acquires a strong interest in finality:
The importance of finality in any justice system, including the criminal justice system, cannot be understated. It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must eventually become final simply to allow effective appellate review of other cases. There is no evidence that subsequent collateral review is generally better than contemporaneous appellate review for ensuring that a conviction or sentence is just. Moreover, an absence of finality casts a cloud of tentativeness over the criminal justice system, benefiting neither the person convicted nor society as a whole.
Witt, 387 So.2d at 925; see also United States v. Addonizio, 442 U.S. 178, 184 n. 11, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (noting that "[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures"). To override the State's interest in finality every time a new rule is decided "would ... destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery *408 of our state ... beyond any tolerable limit." Witt, 387 So.2d at 929-30. Thus, when deciding whether a decision containing new law applies retroactively, "the fundamental consideration is the balancing of the need for decisional finality against the concern for fairness and uniformity in individual cases." State v. Callaway, 658 So.2d 983, 986 (Fla.1995).
The United States Supreme Court first established standards for retroactivity in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Linkletter considered the retroactivity of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which applied the Fourth Amendment's exclusionary rule to the states. In determining whether Mapp applied retroactively, the Court adopted a three-part test that considered (a) the purpose to be served by the new rule, (b) the extent of reliance on the prior rule, and (c) the effect that retroactive application of the new rule would have on the administration of justice. Id. at 636-40, 85 S.Ct. 1731. Under that test, the Court decided that Mapp would apply only to subsequent trials. Id. Two years later, in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Court again applied the three Linkletter factors, cementing their status as the controlling federal test.
We incorporated Linkletter into our own retroactivity analysis in Witt v. State, 387 So.2d at 925. Witt held that a change in the law does not apply retroactively in Florida "unless the change: (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." Id. at 931. We explained that a "development of fundamental significance" is one that "place[s] beyond the authority of the state the power to regulate certain conduct or impose certain penalties," or alternatively is "of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter." Id. at 929. By permitting the retroactive application of new rules only in these limited circumstances, we "declare[d] our adherence to the limited role for postconviction relief proceedings, even in death penalty cases." Id. at 927.
Nine years after we decided Witt, the United States Supreme Court began to turn away from Linkletter. See Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). While acknowledging that new rules of constitutional law should apply to every case pending on direct appeal, the Teague plurality concluded that they should not apply retroactively to postconviction cases unless (1) they place conduct beyond the power of the government to proscribe, or (2) they announce a "watershed" rule of criminal procedure that is "implicit in the concept of ordered liberty." Id. at 311, 109 S.Ct. 1060. Less than a year later, in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Court adopted Teague's retroactivity analysis as its majority view.
Applying the test for retroactivity under Teague, the United States Supreme Court recently held in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), that Ring does not apply retroactively for purposes of federal law. But Summerlin does not control our decision. As courts in other states have noted, state courts are not bound by Teague in determining the retroactivity of decisions. See California v. Ramos, 463 U.S. 992, 1014, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (acknowledging that "[s]tates are free to provide greater protections in their criminal justice system than the Federal Constitution requires"); Colwell v. State, 118 Nev. 807, 59 P.3d 463, 470 (2002) (noting *409 that "[w]e may choose to provide broader retroactive application of new constitutional rules of criminal procedure than Teague and its progeny require"); Cowell v. Leapley, 458 N.W.2d 514, 517 (S.D.1990) (noting that states may decide how to provide access to state postconviction relief). We continue to apply our longstanding Witt analysis, which provides more expansive retroactivity standards than those adopted in Teague. We nevertheless conclude that, even under Witt, Ring does not apply retroactively.

C. Is Ring Retroactive in Florida?
The holding of Ring clearly satisfies the first two prongs of Witt because the United States Supreme Court issued a new rule that is "constitutional in nature." 387 So.2d at 930. Ring's retroactivity therefore depends on the third prong: whether the new rule constitutes a "development of fundamental significance." Id. In Witt, we clarified that most developments of fundamental significance fall within two categories: changes "which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties," and those "which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter." Id. at 929. Ring does not fall within the first category because it does not prohibit the government from criminalizing certain conduct or imposing certain penalties. Thus, the question is whether Ring is of "sufficient magnitude" to require retroactive application under three factors: (a) the purpose to be served by the rule, (b) the extent of reliance on the prior rule, and (c) the effect that retroactive application of the new rule would have on the administration of justice. Id. at 926.[3] We address each factor in turn.

1. Purpose of the New Rule
The first factor under Witt is the purpose to be served by the new rule. Id. The United States Supreme Court noted in Summerlin that its holding in Ring was not a substantive change to the law, but rather a "prototypical procedural rule[]," in that it regulates the manner in which culpability is determined but does not alter the range of conduct or class of persons that the law punishes. 124 S.Ct. at 2523. The Court also determined that Ring does not change the elements of the offense of murder punishable by death, and does not greatly enhance the fairness or accuracy of death penalty proceedings. See id. at 2524-26. Regarding the latter concern, the Court noted that because the burden of proof in Arizona for aggravating factors found by the trial court was "beyond a reasonable doubt," the requirement of Apprendi that facts authorizing an increased sentence be found beyond a reasonable doubt was not at issue in Ring. Id. at 2522 n. 1. Florida law also requires that aggravating factors in death penalty cases be established beyond a reasonable doubt. See Rogers v. State, 783 So.2d 980, 992-93 (Fla.2001).
The Supreme Court cautioned in Ring that its determination of who decides *410 whether a defendant is eligible for the death penalty "does not turn on the relative rationality, fairness, or efficiency of potential factfinders." 536 U.S. at 607, 122 S.Ct. 2428. The Court subsequently stated in Summerlin that "for every argument why juries are more accurate factfinders, there is another why they are less accurate." 124 S.Ct. at 2525. Applying the Teague test, the Court concluded that "[w]hen so many presumably reasonable minds continue to disagree over whether juries are better factfinders at all, we cannot confidently say that judicial factfinding seriously diminishes accuracy." Id.
Deferring to the United States Supreme Court's assessment of its own decision in Ring, we conclude that the purpose of the new rule does not support retroactivity.[4] The purpose of the new rule in Ring is to conform criminal procedure to the Sixth Amendment's jury trial guarantee, and not to enhance the fairness or efficiency of death penalty procedures. In Williams v. State, 421 So.2d 512, 515 (Fla.1982), we refused to apply a rule retroactively in part because it "did not involve an attack on the fairness of the trial." As we recognized in Witt, new rules generally will not warrant retroactive application "in the absence of fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding." 387 So.2d at 929. Ring casts no such doubt. The first Witt factor therefore disfavors retroactive application.

2. Reliance on the Old Rule
The second Witt factor is the extent of reliance on the old rule. Id. at 926. Like the first factor, this one weighs heavily against retroactive application of Ring. Florida has relied to an immeasurably large extent on its capital sentencing scheme. Since Florida's reinstatement of the death penalty in 1972, hundreds of defendants have been sentenced to death employing the procedures in section 921.141, Florida Statutes, that call upon the jury only to render an advisory sentence by majority vote. Fifty-nine defendants have been executed. See Fla. Dep't of Corrections, Death Row Fact Sheet, available at http://www.dc.state. fl.us/oth/deathrow/ index.html. Our situation is very different, for example, from the one the Missouri Supreme Court faced when it applied Ring retroactively. That court concluded that only five collateral cases would potentially be affected. See State v. Whitfield, 107 S.W.3d 253, 269 (Mo.2003).[5] In contrast, about 367 defendants currently reside on Florida's Death Row.
Florida's reliance on its capital sentencing scheme has been entirely in good faith. The United States Supreme Court has examined and upheld Florida's capital sentencing statute for more than a quarter of a century. See Bottoson, 833 So.2d at 695 (citing cases). In Apprendi, decided two years before Ring, the Supreme Court specifically excluded death penalty cases from its holding and confirmed the validity *411 of its prior decision upholding Arizona's sentencing scheme, Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Based on all of the information available at the time of Ring, Florida had every reason to believe that its capital sentencing scheme was constitutionally sound and worthy of reliance. We still have not held otherwise.
That Florida has reasonably relied on its longstanding capital sentencing scheme is an important factor weighing against the retroactive application of Ring. See Williams, 421 So.2d at 515 ("It was reasonable... to rely upon [the old] law. That significant reliance has been placed on the old rule is an important factor supporting [exclusively] prospective application of the new rule."); State v. Towery, 204 Ariz. 386, 64 P.3d 828, 835 (2003) (concluding under the Linkletter test that "the [Arizona] justice system's good faith reliance on Walton v. Arizona weighs against retroactivity").

3. Effect on the Administration of Justice
The third and final Witt factor is the effect that retroactive application will have on the administration of justice. 387 So.2d at 926. This factor, too, weighs heavily against retroactive application of Ring. As we mentioned above, about 367 defendants currently reside on Florida's Death Row. Some have been there for decades. The retroactive application of Ring in Florida would require reconsideration of hundreds of cases to determine whether a new penalty phase is warranted. This reconsideration alone would be a major undertaking.[6] Even though we have rejected numerous Ring claims in postconviction proceedings on grounds other than non-retroactivity, such as existence of a prior violent felony conviction aggravator or a unanimous death recommendation, the United States Supreme Court has not addressed whether these distinctions comport with the Sixth Amendment. One member of this Court, relying on the decision of the Arizona Supreme Court on remand in Ring, has dissented from our conclusion that a single Ring-exempt aggravator permits reliance on other aggravators found solely by the trial judge. See Duest v. State, 855 So.2d 33, 56 (Fla.2003) (Anstead, C.J., concurring in part and dissenting in part), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004). Thus, if Ring were made retroactive its impact on Florida's death-row population would remain unclear.
Resentencing hearings necessitated by retroactive application of Ring would be problematic. For prosecutors and defense attorneys to reassemble witnesses and evidence literally decades after an earlier conviction would be extremely difficult. We fear that any new penalty phase proceedings would actually be less complete and therefore less (not more) accurate than the proceedings they would replace. As we explained in State v. Glenn, 558 So.2d 4 (Fla.1990), where we declined to apply retroactively the double jeopardy ruling of Carawan v. State, 515 So.2d 161 (Fla.1987):
Granting collateral relief ... would have a strong impact upon the administration *412 of justice. Courts would be forced to reexamine previously final and fully adjudicated cases. Moreover, courts would be faced in many cases with the problem of making difficult and time-consuming factual determinations based on stale records. We believe that a court's time and energy would be better spent in handling its current case-load....
Glenn, 558 So.2d at 8; see also Reed v. State, 837 So.2d 366, 370 (Fla.2002) (refusing to apply a new rule retroactively to child abuse cases because it "would require courts to revisit numerous final convictions and to extensively review stale records"); Williams, 421 So.2d at 515 (refusing to apply a new rule retroactively because it would entail hearings with "evidence possibly long since destroyed, misplaced, or deteriorated" and witnesses who "may not be available or [whose] memory might be dimmed"); Towery, 64 P.3d at 835 (recognizing that "[c]onducting new sentencing hearings [for Arizona's 90 death row prisoners], many requiring witnesses no longer available, would impose a substantial and unjustified burden on Arizona's administration of justice").
To apply Ring retroactively in Florida would undermine the perceived and actual finality of criminal judgments and would consume immense judicial resources without any corresponding benefit to the accuracy or reliability of penalty phase proceedings.

4. Conclusion of Retroactivity Analysis
We conclude that the three Witt factors, separately and together, weigh against the retroactive application of Ring in Florida. To apply Ring retroactively "would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state ... beyond any tolerable limit." Witt, 387 So.2d at 929-30. Our analysis reveals that Ring, although an important development in criminal procedure, is not a "jurisprudential upheaval" of "sufficient magnitude to necessitate retroactive application." Id. at 929. We therefore hold that Ring does not apply retroactively in Florida and affirm the denial of Johnson's request for collateral relief under Ring.

III. CONSTITUTIONALITY OF LETHAL INJECTION
Finally, Johnson argues that execution by lethal injection constitutes cruel and unusual punishment in violation of both the Florida and United States Constitutions. This claim is without merit and was properly denied without an evidentiary hearing. See Provenzano v. State, 761 So.2d 1097, 1099 (Fla.2000) (holding that execution by lethal injection is not cruel and unusual punishment); Sims v. State, 754 So.2d 657, 668 (Fla.2000) (same). The claim is also procedurally barred because it was raised and rejected in Johnson's first successive postconviction proceeding. Johnson, 804 So.2d at 1225.

IV. CONCLUSION
For the reasons stated above, we affirm the trial court's summary denial of Johnson's second successive motion for postconviction relief.
It is so ordered.
PARIENTE, C.J., and WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., concurs specially with an opinion, in which CANTERO and BELL, JJ., concur.
CANTERO, J., concurs with an opinion, in which WELLS and BELL, JJ., concur.
*413 LEWIS, J., concurs in result only with an opinion.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
WELLS, J., specially concurring.
I concur in the majority decision. I also concur that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), is not to be applied retroactively and with the excellent discussion of retroactivity in the majority opinion. I continue to agree with the views expressed in Justice Cantero's specially concurring opinion in Windom v. State, 886 So.2d 915, 935-52 (Fla. 2004) (Cantero, J., specially concurring).
I write to make clear that by doing a retroactivity analysis, no implication should be drawn that Ring is otherwise applicable to the Florida capital punishment statute. My view continues to be as stated in my opinions in Bottoson v. Moore, 824 So.2d 115, 122-27 (Fla.2002) (Wells, J., dissenting), and Bottoson v. Moore, 833 So.2d 693, 696-99 (Fla.2002) (Wells, J., concurring specially).
I also do not believe that Johnson states a claim for relief in this successive rule 3.851 motion pursuant to Florida Rule of Criminal Procedure 3.851(d)(2)(B).[7]Ring has not been held to apply retroactively.
CANTERO and BELL, JJ., concur.
CANTERO, J., concurring.
I concur in the majority opinion. I agree that, under the analysis used in Witt v. State, 387 So.2d 922 (Fla.1980), the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not apply retroactively. My views on how we should determine the retroactivity of United States Supreme Court decisions, however, remain the same as they were in Windom v. State, 886 So.2d 915, 935 (Fla.2004) (Cantero, J., specially concurring). I continue to "believe that we should answer questions about the retroactivity of decisions of the United States Supreme Court based on that Court's own standards, as articulated in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and not based on the now-outmoded test we announced in [Witt]." Id. I recognize that a majority of this Court believes that we should continue to apply Witt. But today's decision illustrates the prudence of applying Teague.
The test for retroactivity that we adopted in Witt was, at the time, the controlling federal test for retroactivity. In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the United States Supreme Court had adopted a three-part test for retroactivity that considered (a) the purpose to be served by the new rule, (b) the extent of reliance on the prior rule, and (c) the effect that retroactive application of the new rule would have on the administration of justice. Id. at 636-40, 85 S.Ct. 1731. We directly incorporated those three factors into our own analysis in Witt. 387 So.2d at 929. We also held that rules would be retroactive if they "place[d] beyond the authority of the state the power to regulate certain conduct or impose certain penalties." Id.
Less than a decade after we adopted the Linkletter approach, the United States Supreme Court receded from it. In Teague v. Lane, a plurality of the Court recognized *414 that "[t]he Linkletter retroactivity standard has not led to consistent results," 489 U.S. at 302, 109 S.Ct. 1060, and that "commentators have `had a veritable field day' with the Linkletter standard, with much of the discussion being `more than mildly negative.'" Id. at 303, 109 S.Ct. 1060. The primary problem with the Linkletter factors was their malleability. They were difficult for courts to apply consistently, and thus produced an "unfortunate disparity in the treatment of similarly situated defendants on collateral review." Id. at 305, 109 S.Ct. 1060. They also gave insufficient weight to the interest of finality. Id. at 310, 109 S.Ct. 1060.
To resolve these problems, the Teague plurality embraced a more restrictive approach. New rules would not be applied retroactively unless they (1) placed conduct beyond the power of the government to proscribe, or (2) announced a "watershed" rule of criminal procedure that "implicate[s] the fundamental fairness of the trial" and is "implicit in the concept of ordered liberty." Id. at 311-12, 109 S.Ct. 1060 (quoting Mackey v. United States, 401 U.S. 667, 693, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)). For the second prong to be satisfied, the new rule would need to be one "without which the likelihood of an accurate conviction is seriously diminished." Id. at 313, 109 S.Ct. 1060. Within a year, a majority adopted the Teague plurality's analysis. See Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).
By now, of course, most states have adopted the Teague standard, at least when determining the retroactivity of constitutional decisions of the United States Supreme Court. Windom, 886 So.2d at 943 n. 28 (Cantero, J., specially concurring). We remain one of a minority of states that has not adopted Teague in any manner. Id. Instead, we persist in applying the three Linkletter factors that the United States Supreme Court abandoned more than fifteen years ago.
Our reluctance to follow the Supreme Court's lead would be easier to understand if our decision in Witt had marked a divergence from federal views on retroactivity. Justice Anstead's dissent suggests that it did. He writes that "in Florida we long ago decided, for reasons of justice and fairness, to apply a very different standard to determine retroactivity." Dissenting op. at 418. But the reality is that in Witt we did not consciously decide to forge our own "very different standard" of retroactivity. To the contrary, we adopted the then-existing federal standard. We moved Florida into line with, rather than setting it apart from, federal law. Now that the federal law has changed, the spirit of Witt would seem to justify a corresponding change in Florida law.
I explained in my Windom concurrence why it would be prudent to adopt Teague in determining the retroactivity of United States Supreme Court decisions:
We should not apply a different standard for determining the retroactivity of United States Supreme Court decisions than that Court itself applies. Consistency among the states  and between the state and federal courts  in applying decisions of the United States Supreme Court demands that, to the extent possible, standards for retroactivity be uniform. Otherwise, the retroactivity of a decision of the Supreme Court will depend on the jurisdiction in which the defendant was prosecuted. Although such a result is sometimes unavoidable, we should attempt as much as possible to limit such lack of uniformity. Also, even more than Linkletter, the Teague standards respect the finality of decisions, *415 a concept we considered of utmost importance in Witt.

886 So.2d at 944. The same reasoning holds true today. Alignment with Teague would promote uniformity, predictability, and finality of decisions. Thus, I again urge this Court to apply the Teague standard when determining the retroactivity of United States Supreme Court decisions.
Like most retroactivity cases, this case would have been much easier to resolve under Teague than under Witt. As Justice Anstead acknowledges in his partial dissent, "there is no doubt that Ring ... would not be retroactively applied under the federal standard." Dissenting op. at 418. The United States Supreme Court, employing a Teague analysis, has held that Ring does not apply retroactively. Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). We would have benefited from the Supreme Court's guidance if we also employed a Teague analysis.
The Teague standards are also easier to apply because they are more demanding and less malleable than the Witt standards. Whereas Witt establishes a nebulous balancing test with three factors that can be difficult to gauge (the purpose of the new rule, the reliance upon the old rule, and the effect of retroactive application on the administration of justice), Teague straightforwardly requires courts to determine whether a new procedural rule is one "without which the likelihood of an accurate conviction is seriously diminished." Summerlin, 124 S.Ct. at 2523 (quoting Teague, 489 U.S. at 313, 109 S.Ct. 1060). Unless a rule falls within that "extremely narrow" class, id., Teague bars retroactive application. Ring clearly falls short of that exacting standard, for the reasons expressed by the United States Supreme Court in Summerlin.
I hope that in future cases this Court will consider the benefits of applying Teague when determining the retroactivity of United States Supreme Court decisions. Not only is Teague the standard applied by the Supreme Court and most other states; it is also the standard that better promotes the important interests of consistency and finality of decisions. The time is right to move beyond Witt by doing precisely what Witt did: incorporate into Florida law the prevailing federal standard for retroactivity.
WELLS and BELL, JJ., concur.
LEWIS, J., concurring in result only.
I concur in result only because I do not agree with a substantial portion of the majority's discussion. First, Ring facially has no application in this case because prior violent felony convictions preceded the conviction here rendering Ring a non-issue. Second, many of Justice Anstead's observations with regard to elements of the Witt analysis are cogent comments directed to the unquestionably unique circumstances of death penalty jurisprudence. The majority's view with regard to finality and the extent of reliance upon an old rule is misdirected and overly critical of Justice Anstead's legitimate concerns and analysis. Thoughtful consideration of genuine issues should not be relegated to the category of "ignoring the obvious" as the majority responds here. Most assuredly, retroactive application of any principle of law is somewhat "problematic" but that criterion alone should not be the criterion and yardstick to measure the result when the ultimate penalty of death is at issue.
I am compelled to agree, however, that even though Ring is not truly an issue here, if this Court proceeds to decide the retroactive issue in this case, the majority result is correct. The United States Supreme *416 Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was confronted with the issue of whether a judge, sitting without a jury, could conduct the fact-finding necessary to enhance a defendant's sentence by two years under a "hate-crimes" statute. In conducting its analysis, the Supreme Court first acknowledged the importance of the interests that were at stake, see id. at 476, 120 S.Ct. 2348 ("At stake in this case are constitutional protections of surpassing importance."), and the Court then announced a bright-line rule of law that would protect those interests appropriately: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.
Two years later, the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), applied Apprendi's bright-line rule to capital cases, holding as follows: "Because... aggravating factors operate as `the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." Ring, 536 U.S. at 609, 122 S.Ct. 2428 (citation omitted). The Court explained further:
The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the fact-finding necessary to put him to death.
Id. at 609, 122 S.Ct. 2428. Based on language in both Apprendi and Ring, these decisions initially appeared to implicate constitutional interests of the highest order and seemed to go to the very heart of the Sixth Amendment. And yet, two years after Ring was decided, the Supreme Court appears to have somewhat altered the foundation.
When asked to decide the retroactivity of Ring, the United States Supreme Court in Schriro v. Summerlin, 542 U.S. 348, ___, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004), first explained that "[t]his holding [in Ring] did not alter the range of conduct Arizona law subjected to the death penalty" and that Ring therefore was procedural rather than substantive. Id. at 2523. Second, the Court relied upon its own prior decision in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (declining to give retroactive application to a 1968 decision that extended the jury-trial guarantee to the states), and concluded that Ring did not establish a "watershed rule of criminal procedure":
If under DeStefano a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be.
Summerlin, 124 S.Ct. at 2526. The Court then held: "Ring announced a new procedural rule that does not apply retroactively to cases already final on direct review." Summerlin, 124 S.Ct. at 2526.
Based on Summerlin  as surprising as that decision may be[8] in light of the Supreme Court's own prior language in Apprendi and Ring  I can only conclude that Ring simply cannot be applied retroactively in Florida upon application of our Witt[9] analysis. The United States Supreme *417 Court is the ultimate arbiter of the federal constitution, and the decision in Ring is that Court's own Sixth Amendment interpretation and application as it extended the Apprendi principles into the capital context. If the United States Supreme Court has held and stated that Apprendi principles as applied in the capital context in Ring are not a "watershed rule of criminal procedure" but merely a "new procedural rule that does not apply retroactively," then I am precluded from determining that these decisions are of fundamental significance, significant magnitude or constitute a "jurisprudential upheaval" under Florida law, even though if writing upon a clean slate I would certainly do so. Further, the purpose served by a new rule of law is a key factor in determining retroactivity in Florida,[10] and the United States Supreme Court in DeStefano held that the purpose served by the jury-trial guarantee ("to prevent arbitrariness and repression") "favor[s] only prospective application" of that guarantee to the states.[11] Therefore, I cannot logically say that the purpose served by the jury fact-finding requirement of Apprendi and Ring favors a different treatment in this regard. The interpretations of the concepts discussed in Apprendi and Ring by the United States Supreme Court drive my consideration that Ring cannot be classified as being of fundamental significance or of significant magnitude to cause retroactive application.
Based on the foregoing, I must agree that Ring is inapplicable in this post-conviction case.
ANSTEAD, J., concurring in part and dissenting in part.
Today, the majority acknowledges that in Florida a number of persons may be put to death in violation of their right to a trial by jury under the Sixth Amendment to the U.S. Constitution; yet, the majority nevertheless concludes that we are not going to do anything about it. With today's holding, the majority has reduced to insignificance two of the most important United States Supreme Court decisions rendered in modern times impacting our criminal law and our death penalty jurisprudence. See Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[12]
In doing so, it appears that the majority has failed to properly apply the test this Court long ago established for determining retroactivity in Witt v. State, 387 So.2d 922, 931 (Fla.1980), and instead has implicitly relied upon a narrow and irrelevant federal standard which for very good reason has never been adopted by this Court. *418 While I agree there is no doubt that Ring and Apprendi would not be retroactively applied under the federal standard, in Florida we long ago decided, based upon reasons of justice and fairness, to apply a very different standard to determine retroactivity.[13] As the majority acknowledges, our decision on retroactivity turns on whether the Supreme Court's decision in Ring has fundamental significance as contemplated by the test for retroactivity set out in Witt. Because I conclude that the Ring decision is clearly one of fundamental significance, I dissent to Part II of the majority opinion.

Witt
Although the majority ultimately purports to examine the question of Ring's retroactivity pursuant to Witt, it ignores our precedent where this retroactivity analysis was actually applied. In fact, if it had examined our precedent, it would have found that we have applied numerous decisions retroactively; and many of these decisions, while important in their own right, were of far less significance than the United States Supreme Court's landmark holdings in Apprendi, and its progeny, Ring.[14] Under any comparative analysis, there is *419 simply no way that our holding today can be squared with our own prior retroactivity decisions applying Witt.

Teague
In addition to ignoring this Court's decisions applying Witt, the majority's conclusions are flawed by the fact that they implicitly rely on United States Supreme Court and other federal decisions that evaluate retroactivity under the irrelevant and considerably more restrictive federal standard announced in the plurality opinion in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), rather than the controlling standard we adopted in Witt. Tellingly, as in Teague, the majority analysis appears to singularly rely upon the value of finality and rare changes in substantive law, in its analysis and conclusion, *420 while wholly disregarding the test we adopted in Witt and the fundamental importance of the constitutional right to a jury trial in the American justice system reaffirmed in the Apprendi and Ring decisions. It is apparent that the majority has failed to honor Witt's express concern with fundamental issues of judicial process as well as substance. The majority appears to favor a more restrictive view that would exclude issues of process altogether from any retroactivity analysis.[15]
There are fundamental and critical differences between the federal retroactivity rule and the rule for retroactivity we adopted in Witt.[16] As has already been eloquently stated in Witt:
The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."

Witt, 387 So.2d at 925 (emphasis added) (quoting ABA Standards Relating to Post-Conviction Remedies § 2.1 cmt. at 37 (Approv. Draft 1968)); see also State v. Callaway, 658 So.2d 983, 987 (Fla.1995) ("The concern for fairness and uniformity in individual cases outweighs any adverse impact that retroactive application of the rule might have on decisional finality."). Thus, Witt expressly embraces concerns about the fairness of the judicial process.
Although I, too, agree that "[t]he importance of finality in any justice system, including the criminal justice system, cannot be understated," see Witt, 387 So.2d at 925, finality must be balanced by fairness. See Witt; Ferguson v. State, 789 So.2d 306, 312 (Fla.2001) (stating that the final Stovall/Linkletter "consideration in the retroactivity equation requires a balancing of the justice system's goals of fairness *421 and finality").[17] And, as is apparent from the quote from Witt set out above, our retroactivity analysis comprehends both "the substantive [and the] procedural underpinnings of a final conviction and sentence."[18] Hence, concerns about process are not secondary under our Witt standard as they would appear to be under the restrictive federal standard applied in Teague and Schriro. The majority ignores this holding of Witt.
Today, contrary to our admonitions in Witt, Callaway, and Ferguson, the majority has indeed rendered a decision "depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases." Witt, 387 So.2d at 925. As Justice Breyer has eloquently explained on this precise issue:
Consider, too, the law's commitment to uniformity. Is treatment "uniform" when two offenders each have been sentenced to death through the use of procedures that we now know violate the Constitution  but one is allowed to go to his death while the other receives a new, constitutionally proper sentencing proceeding? Outside the capital sentencing context, one might understand the nature of the difference that the word "finality" implies: One prisoner is already serving a final sentence, the other's has not yet begun. But a death sentence is different in that it seems to be, and it is, an entirely future event  an event not yet undergone by either prisoner. And in respect to that event, both prisoners are, in every important respect, in the same position. I understand there is a "finality-based" difference. But given the dramatically different nature of death, that difference diminishes in importance.
Certainly the ordinary citizen will not understand the difference. That citizen will simply witness two individuals, both sentenced through the use of unconstitutional procedures, one individual going to his death, the other saved, all through an accident of timing. How can the Court square this spectacle with what it has called the "vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason"?
Schriro, 124 S.Ct. at 2529 (Breyer, J., dissenting) (citations omitted). Unlike Justice Breyer, the majority has simply chosen to ignore "fairness and uniformity" or Witt's concerns about "process no longer considered acceptable," and has turned a blind eye to the most important and unique feature of the American judicial process upon which we have relied for centuries to insure fairness and justice for our citizens: the right to trial by jury. No other right in our system has been so jealously guarded, until today.

Fundamental Significance Under Witt

After acknowledging that the determinative question under Witt is whether the Ring decision is one of "fundamental significance" the majority's analysis proceeds to ignore the plain meaning of these two words. Understandably, perhaps, the majority simply avoids the use of these key words in its analysis. Further, except for its implicit reliance on Teague and its concern *422 for finality, it is difficult to comprehend the majority's conclusion that the Apprendi and Ring decisions are not of "fundamental significance" as contemplated by Witt. That they are decisions of "fundamental significance" is apparent on both the face of the Apprendi and Ring opinions and upon any fair appraisal of their purpose and significance to the American justice system.

Fundamental Significance of Apprendi and Ring

For starters, the majority's rejection of the significance of the Apprendi and Ring decisions directly conflicts with the clear and unambiguous characterization of their significance in the United States Supreme Court opinion in Apprendi itself. Ring, of course, applies Apprendi in the heightened death penalty context by requiring that a jury, not a judge, determine the existence of factual aggravators that may serve as a basis for a death sentence. As to whether its decision was one of fundamental significance, the Apprendi court declared:

At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."
Apprendi, 530 U.S. at 476-77, 120 S.Ct. 2348 (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)) (emphasis supplied) (footnote omitted). Surely this language resolves any doubt as to the fundamental significance of the Court's decisions. One might logically ask how a decision mandating "constitutional protections of surpassing importance" could be categorized as anything other than a decision of fundamental significance, especially when they are applied by Ring in the "death is different" context of death penalty law and its elevated concern for the fairness of the process and strict adherence to constitutional safeguards.
Moreover, the Supreme Court's opinion in Apprendi pointedly described New Jersey's statutory scheme that allowed a judge to find the facts necessary to increase a defendant's sentence beyond the statutory maximum as "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." Id. at 497, 120 S.Ct. 2348. Tellingly, the principal dissent in Apprendi also recognized its importance as a groundbreaking change in the law. See id. at 524, 120 S.Ct. 2348 (O'Connor, J., dissenting) (referring to Apprendi as a "watershed change in constitutional law"). Today, that "watershed change in constitutional law" is brushed off by the majority as a minor procedural convenience even where its application, as noted by Justice Breyer, may quite literally mean the difference between life and death.[19]
*423 In fact, the fundamental significance of Apprendi and Ring have recently been emphatically reaffirmed by the United States Supreme Court in its decision in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). As if the Court's words in Apprendi and Ring were not enough, let us consider the words most recently used by the Court in Blakely assessing the fundamental significance of the Apprendi decision:
Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed.1981) (describing the jury as "secur[ing] to the people at large, their just and rightful control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850) ("[T]he common people, should have as complete a control ... in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) ("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); Jones v. United States, 526 U.S. 227, 244-248, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.
....
Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As Apprendi held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissenters' alternative, *424 he has no such right. That should be the end of the matter.
Blakely, 124 S.Ct. at 2538-39, 2543 (emphasis supplied). Contrary to the Supreme Court's language in Blakely admonishing that Apprendi should not be treated as a "mere procedural formality," the majority has done just that in rejecting its fundamental significance. Is it possible that a United States Supreme Court decision upholding the "fundamental reservation of power [to the people] in our constitutional structure" cannot be one of fundamental significance?
Further, Ring's language that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death" cannot be so casually ignored in our assessment of fundamental significance. Ring, 536 U.S. at 609, 122 S.Ct. 2428. As I have commented in other contexts, the application of Apprendi in Ring is clearly the most significant death penalty decision to come from the United States Supreme Court in the past thirty years. "Ring is clearly the most significant death penalty decision of the United States Supreme Court since the decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), invalidating the death penalty schemes of virtually all states." Bottoson v. Moore, 833 So.2d 693, 703 (Fla.2002) (Anstead, C.J., concurring in result only); see Duest v. State, 855 So.2d 33, 57 (Fla. 2003) (Anstead, C.J., concurring in part and dissenting in part). Under the "death is different" jurisprudence mandated by the United States Supreme Court, the significance of Apprendi as applied in Ring is heightened, not diminished.
In essence, the majority has chosen to ignore the plain meaning of the words "fundamental significance" as contemplated by Witt, as well as the plain meaning of the actual words used by the United States Supreme Court in its opinions describing the nature and importance of its decisions upholding the right of an American citizen to due process and a trial by jury in Apprendi and Ring. When the Supreme Court's own characterizations of its decisions are considered in their plain meaning, the conclusion that these decisions are of fundamental significance should be a "no-brainer," a "slam dunk." Instead, the majority has determined these decisions are "no big deal" rather than of fundamental significance.

Bottoson
In fact, in this Court's first decision following Ring, Justice Shaw has already expressly done a straightforward retroactivity analysis under Witt and correctly concluded that Ring was of fundamental significance and should be applied retroactively:
First, Ring falls within the ambit of Witt, for it emanated from the United States Supreme Court. Second, Ring is constitutional in nature, for its holding goes to the very heart of the constitutional right to trial by jury. And third, Ring is of "fundamental significance," for its purpose is to safeguard the basic protections guaranteed by the right to trial by jury. This Court in the past has applied retroactively other significant decisions of the United States Supreme Court in the capital sentencing area.
Bottoson v. Moore, 833 So.2d 693, 717 (Fla. 2002) (Shaw, J., concurring in result only) (footnote omitted). Justice Shaw's analysis is clearly sound in its application of our controlling decision in Witt and, importantly, in his observation that we have retroactively applied other significant decisions of the United States Supreme Court on numerous *425 occasions.[20] Notably, like Justice Shaw, the only state court that has examined Ring under a retroactivity test similar to Florida's under Witt has found that Ring should be applied retroactively. See State v. Whitfield, 107 S.W.3d 253, 268 (Mo.2003) (concluding that Ring should apply retroactively under the Stovall/Linkletter test and rejecting the applicability of Teague). But the majority has ignored Justice Shaw's analysis and his conclusion that Ring's "purpose is to safeguard the basic protections guaranteed by the right to trial by jury." Id. Instead, the majority has demeaned the purpose of Ring by asserting it to be a mere technical and inconsequential correction of procedure.
It is also apparent on the face of the various opinions in Bottoson that a majority of justices of this Court believed the Ring decision was of fundamental significance and had a significant impact on Florida's capital sentencing law. See Bottoson, 833 So.2d at 705 (Anstead, C.J., concurring in result only) ("If the holdings of Ring and Apprendi are to be applied as written, it is apparent that Florida's sentencing scheme is at risk because of the scheme's express reliance upon findings of fact made by the trial judge rather than findings of fact made by a jury in determining the existence of aggravating circumstances which must be established and utilized as a basis for imposing the penalty of death."); Bottoson, 833 So.2d at 719 (Pariente, J., concurring in result only) ("However, based on the reasoning of the majority of the United States Supreme Court in Ring and Justice Scalia's separate concurrence in Ring, I agree with Chief Justice Anstead that Ring does raise serious concerns as to potential constitutional infirmities in our present capital sentencing scheme."); Bottoson, 833 So.2d at 734 (Lewis, J., concurring in result only) ("I am gravely concerned regarding the constitutionality of jury overrides under Ring and I cannot silently afford blind adherence to authorities which are now in apparent irreconcilable conflict with Ring."); Bottoson, 833 So.2d at 717 (Shaw, J., concurring in result only) ("Ring, however, by treating a `death qualifying' aggravator as an element of the offense, imposes upon that aggravator the same rigors of proof as other elements, including Florida's requirement of a unanimous jury finding. Ring, therefore, has a direct impact on Florida's capital sentencing statute.").[21] In fact, starting with the decisions in Bottoson and King, this Court has applied Ring retroactively in dozens of death penalty cases in the postconviction context. That record too is ignored by the majority.

Stovall/Linkletter Analysis
After failing to examine the plain meaning of the fundamental significance prong of our Witt analysis, the majority attempts to rely upon a flawed Stovall/Linkletter analysis to justify its decision. However, the weakness of the majority's analysis of the Stovall/Linkletter factors is apparent. If anything, a proper analysis of those factors yields as strong a case for retroactivity as does the "plain meaning" analysis set out above. Under such an analysis it is readily apparent that we are dealing with the most important value in our criminal justice system (the right to a jury trial), applied in the most sensitive category of criminal cases (death penalty cases), which, because of their limited number will have the least disruptive effect on our *426 criminal justice system. Hence, Ring presents the classic case for retroactive application under our test in Witt.
First, unlike Justice Shaw, the majority completely misconstrues the purpose of the Ring holding to uphold the fundamental constitutional right to a jury trial in the determination of fact-based aggravators that may be utilized to impose a sentence of death. Contrary to Justice Shaw's recognition of the fundamental importance of this right, and Ring's protection of this right, the majority dismisses Ring's purpose as being one merely involving technical and inconsequential criminal procedure. Consider how different this is from the United States Supreme Court's statement in Apprendi that it was enforcing "constitutional protections of surpassing importance."
And, of course, the majority ignores the heightened consideration that the issue should receive in the "death is different" context of Ring. Nowhere is this context even recognized in the majority's analysis. Imagine applying the majority's demeaning characterization of the purpose of Ring in a case where the finding of an aggravator may literally determine whether someone lives or dies. It is obvious that Justice Shaw got it right when he stated in Bottoson that Ring's "purpose is to safeguard the basic protections guaranteed by the right to trial by jury" before someone's life can be forfeited.
Second, in its discussion of reliance on the prior unconstitutional practice, the majority overinflates the impact of Ring in Florida. The majority acts as if a few hundred cases is a huge number in Florida's criminal justice system. The fact is that death penalty cases, for obvious reasons, constitute the smallest category of cases in our criminal justice system. Considering the tens of thousands of inmates in our penal system, the few hundred death cases are but a modest few, a tiny percentage. In fact, many of our prior decisions on retroactivity have affected thousands of inmates. But that did not prevent us from applying decisions of fundamental importance retroactively.
Further, the majority ignores the fact that not one conviction for first-degree murder will be disturbed under Ring. None. Rather, only the penalty phase portion of a death case would be impacted if the defendant could demonstrate that a critical and essential aggravator was not found by the jury.
Other than relying on numbers, the majority repeats the obvious that the State has relied on its prior practice denying jury fact-finding in good faith. But that is a non sequitur. No one has asserted otherwise. The same, of course, can be said in every case where important constitutional rights were eventually recognized and old practices condemned. Such was obviously the case in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), where virtually all states had refused indigent defendants the right to assistance of counsel during the judicial process. But that did not deter this Court from applying Gideon retroactively to thousands of Florida criminal felony cases.
Third, the majority's analysis on the effect of applying Ring on the administration of justice in Florida is just a repeat of the false numbers game, when in fact the impact would be modest and the administration of justice would be greatly enhanced by assuring that all of those sent to their deaths were first granted their constitutional right to a jury trial in the determination of fact-based aggravators. Even the unlikely grant of a right to trial by jury in a few hundred cases would have a de minimis effect on Florida's criminal justice system where tens of thousands of *427 convicted inmates are now housed in its prisons.
Perhaps most tellingly, the majority completely ignores in its analysis the fact that this Court has already considered dozens of Ring claims on their merits and in postconviction appeals, and has turned down every one. In effect this Court has so narrowly interpreted Ring or so frequently found exceptions to its application that a Ring claimant has virtually no chance of success in this Court. Hence, based upon this Court's own track record in rejecting Ring claims on their merits, it is pure sophistry to suggest that Ring will have a substantial impact in Florida on large numbers of cases. While I have disagreed with many of those resolutions, there is no denying their existence and their consistent message of rejection on the merits. Indeed, one is left to wonder whether there is any case out there that could meet the narrow interpretation of Ring this Court has adopted.

Fundamental Significance of Right to Jury Trial
All of this discussion is subsumed, of course, under the issue of whether Ring is a decision of fundamental significance. In short, whether you apply the plain meaning test or the Stovall/Linkletter analysis, it remains apparent that Ring is of "fundamental significance." In denying Ring's significance, the majority simply refuses to acknowledge that our Witt analysis, unlike the federal analysis in Teague, is equally concerned with important issues of process. It is one thing for a Teague analysis, which openly disfavors retroactive application of procedural changes in the law, to come to such a conclusion; but it is quite another for this Court to reject our express concerns in Witt with both substantive and procedural changes in the law.
In its failure to recognize the importance of process under Witt, the majority also "fundamentally" misperceives the values this country was founded upon and ignores hundreds of years of our unique legal traditions. The right to a jury trial is not only recognized as the most important right involving our justice system set out in our constitution, its roots rest in the most revered legal document of our Anglo-American legal tradition, the Magna Carta. Countless thousands of English and American patriots have recognized and defended the right of jury trial as the very foundation of our justice system. In 1762, David Hume, the English philosopher, wrote that "trial by jury is the best institution calculated for the preservation of liberty and the administration of justice that was ever devised by the wit of man." Similarly, Thomas Jefferson declared in 1788, "I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." See J. Kendall Few, In Defense of Trial by Jury 214, 311, American Jury Trial Foundation (1993). Of course, Apprendi and Ring say the same thing. Indeed, this Court's first chief justice, Chief Justice Douglas, eloquently assessed the importance of this right in 1848 when he spoke for a unanimous Court in declaring:
When however it is remembered with what jealous and scrupulous regard "the right of trial by jury" has ever been cherished and preserved by our Anglo Saxon ancestors, and by the Fathers of the revolution of 1776, a regard transmitted to us their descendants not only with unabated attachment, but if possible with increased interest and regard  a Magna Charta shielding every one in the enjoyment of life liberty and property: When these things are borne in mind and a Legislative act in its terms abridges this hallowed right, or its provisions are subversive of the principles *428 of natural justice and against common reason and common right, the duty of the court, though unpleasant and even painful, is too obvious to be doubted or denied.
Flint River Steam Boat Co. v. Roberts, Allen & Co., 2 Fla. 102, 115 (1848). One can only wonder as to what our Founding Fathers and Chief Justice Douglas would say about this Court's failure today to recognize the fundamental importance of the right to a trial by jury in our American society.
In discussing the right to a jury trial as one only involving mere technical procedural rights, the majority clearly misses the point that we have adopted a procedural system of justice in this country (often referred to as an adversarial system), that relies upon procedural safeguards to insure just results. As the majority opinion in Blakely explains:
Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As Apprendi held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissenters' alternative, he has no such right. That should be the end of the matter.
Blakely v. Washington, 124 S.Ct. at 2543 (emphasis added). Nowhere does the majority confront the nature of our justice system and its fundamental reliance on process to obtain a just outcome.
In other words, unlike the civil jurisdictions in Europe and elsewhere, our guarantee of justice rests virtually entirely upon the procedural safeguards we have put in place. The guarantee of these safeguards and due process provides the foundation for the Rule of Law in this country and its placement in our federal constitution was virtually demanded by our citizens in the very first session of the U.S. Congress. The right to trial by jury is perhaps the most important ingredient in that foundation and the due process we have guaranteed our citizens, and the opinions in Apprendi, Ring, and Blakely make that clear. Witt, of course, mandates that we recognize decisions of fundamental significance affecting the judicial process.

CONCLUSION
We must remember that the key question under Witt is whether Apprendi and Ring constitute decisions of "fundamental significance." Despite the United States Supreme Court's characterization of its decision in Apprendi as one requiring "constitutional protections of surpassing importance," and its recent reaffirmation of Apprendi's importance in Blakely, characterizing the right to a jury trial as a "fundamental reservation of power in our constitutional structure," the majority has found the holdings in Apprendi and Ring to be of minor significance. In its fixation on finality, and failure to recognize the importance of process, the majority has written off the significance of the Apprendi and Ring decisions. The United States Supreme Court's own characterizations of the significance of these decisions directly refutes this conclusion. In other words, the Supreme Court's opinions repeatedly make clear that we are dealing with values *429 fundamental to the American constitutional scheme for criminal justice and we are doing so in the context of the death penalty where the "death is different," admonition requires strict adherence to a fair process.[22]
Ultimately, however, the overriding interests of fairness and uniformity make it impossible to justify a decision that deprives individuals of their life based on a fact-finding process that has been determined to be violative of fundamental constitutional rights. See Witt, 387 So.2d at 925. Our admonition in Witt bears repeating here:
The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."

Witt, 387 So.2d at 925 (emphasis added). These words fit precisely the situation we face today in determining whether to permit persons to go to their deaths in open violation of their fundamental and constitutional right to trial by jury. As Justice Breyer so eloquently stated in Schriro, it is virtually impossible to justify this breach in fairness and uniformity by allowing some prisoners to be put to death in violation of their right to trial by jury while carefully assuring that others receive this right. Justice has not been served today.
NOTES
[1] Claim I was a "newly discovered evidence" claim. Johnson alleged that his due process and equal protection rights were violated because the Florida Department of Law Enforcement (FDLE) and the Ninth Circuit State Attorney's Office withheld access to documents relevant to his case. He requested that the circuit court conduct an in-camera inspection of various sealed documents pursuant to Florida Rule of Criminal Procedure 3.852(f). Claim II alleged cumulative error as a ground for relief. Claim III alleged that Johnson's death sentence was unconstitutional under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Claim IV alleged that execution by lethal injection constitutes cruel and unusual punishment.
[2] These were: (1) that Johnson committed the murder in a cold, calculated and premeditated manner; (2) that he committed the murder to avoid lawful arrest; (3) that he committed the murder during a robbery and for pecuniary gain, which the judge merged into one factor; and (4) that he had been convicted of prior violent felonies, including attempted robbery and attempted murder. Johnson, 442 So.2d at 197.
[3] Justice Anstead argues that before analyzing Ring under these three specific factors from Witt, we should first consider "the plain meaning of the words `fundamental significance.'" Dissenting op. at 424. However, as we read Witt, the meaning of the phrase "fundamental significance" is not wholly separate from the three specific factors; rather, it is informed by them. As we explained in Witt, those three factors are "the essential considerations in determining whether a new rule of law should be applied retroactively." 387 So.2d at 926 (emphasis added). They guide us in "defining the line where finality gives way to fairness." Id. at 925. Specifically, they focus our inquiry on whether Ring is fundamentally significant along the relevant dimensions of "fairness and uniformity." Id.
[4] We are not, as Justice Anstead suggests, relying on the federal standard for retroactivity. Dissenting op. at 417-18, 419. We defer not to the federal standard, but rather to the Supreme Court's characterization of the purpose of Ring. To the extent that the purpose of Ring is a factor in our own retroactivity test, a recent discussion of that purpose by the very Court that decided Ring is obviously worthy of our attention and deference.
[5] We, too, have applied new rules retroactively where the extent of reliance on the old rule has been minimal. See, e.g., Ferguson v. State, 789 So.2d 306, 311 (Fla.2001) (stating that the old rule "has not been relied on extensively"); State v. Callaway, 658 So.2d 983, 987 (Fla.1995) (stating that "reliance could have existed for only a short period of time").
[6] Justice Anstead responds that "considering the tens of thousands of inmates in our penal system, the few hundred death cases are but a modest few, a tiny percentage." Dissenting op. at 426. But to equate death penalty cases with cases involving lesser crimes and punishments would be to ignore the obvious: death penalty cases require a much larger investment of societal resources than the average criminal case. We respectfully disagree with Justice Anstead's assertion that the grant of new penalty phases "in a few hundred [death penalty] cases would have a de minimis effect on Florida's criminal justice system." Dissenting op. at 426. We think the effect would be quite substantial.
[7] Rule 3.851(d)(2)(B) states:

(2) No motion shall be filed or considered pursuant to this rule if filed beyond the time limitation provided in subdivision (d)(1) unless it alleges that
....
(b) the fundamental constitutional right asserted was not established within the period provided by subdivision (d)(1) and has been held to apply retroactively....
[8] Cf. Apprendi, 530 U.S. at 538, 120 S.Ct. 2348 (O'Connor, J., dissenting) (terming the majority's reasoning in Apprendi "baffling, to say the least").
[9] Witt v. State, 387 So.2d 922 (Fla.1980).
[10] See id. at 926 (holding that the retroactivity of a new rule of law may be determined by assessing (a) the purpose served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of retroactive application of the new rule).
[11] DeStefano, 392 U.S. at 633, 88 S.Ct. 2093 (explaining that the "purpose" served by a new rule of law is one of three factors for determining retroactivity under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and then holding that "[a]ll three factors favor only prospective application" of the jury-trial guarantee to the states).
[12] While the Ring decision may be of even greater significance than the Supreme Court's earlier holding in Apprendi, because Ring impacts our death penalty law, and "death is different," my reasons for dissent are largely the same as I set out in Hughes v. State, 901 So.2d 837 (Fla. 2005), where the majority held that Apprendi was not a decision of fundamental significance. Ring, of course, simply represents an application of Apprendi in the death penalty context, and mandates that a jury, not a judge, must determine the existence of any aggravating factors used as a basis to impose the death penalty.
[13] The United States Supreme Court has recently decided in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), that Ring should not be retroactively applied in the federal courts. Of course, Schriro was applying the federal standard from Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and therefore does not control the question of retroactivity in Florida.

In fact, Schriro is a text-book example for why the states should be wary of embracing Teague. Its application with regard to Ring has yielded a result that is fundamentally unfair, internally inconsistent, and unreasonably harsh. The Supreme Court notes that "[t]he right to jury trial is fundamental to our system of criminal procedure," see Schriro, 124 S.Ct. at 2526, yet arbitrarily concludes that this fundamental right should not be enjoyed by those facing executions and unfortunate enough to fall on the wrong side of Ring's release date. As I have noted in Hughes, "[i]f anything, the more restrictive standards of federal review place increased and heightened importance upon the quality and reliability of the state proceedings." Hughes v. State, 901 So.2d 837 (Fla. 2005) Applying Apprendi and Ring retroactively is favored by "the legal system's commitment to `equal justice'  i.e. to `assur[ing] a uniformity of ultimate treatment among prisoners.'" Schriro, 124 S.Ct. at 2528-29 (Breyer, J., dissenting) (quoting Mackey v. United States, 401 U.S. 667, 689, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971)). Thus, while unfortunate, the decision in Schriro only reaffirms the importance of Florida's independent consideration of retroactivity under Witt.
[14] See, e.g., State v. Klayman, 835 So.2d 248, 254 (Fla.2002) (holding that decision in Hayes v. State, 750 So.2d 1, 5 (Fla.1999), which held that section 893.135(1)(c)(1), Florida Statutes (Supp.1996), was only intended to apply to Schedule I and II drugs, warranted retroactive application); Ferguson v. State, 789 So.2d 306, 309-312 (Fla.2001) (holding that decision in Carter v. State, 706 So.2d 873, 875 (Fla.1997), which held that a competency hearing is required in postconviction proceedings "when there are reasonable grounds to believe that a capital defendant is incompetent to proceed in postconviction proceedings in which factual matters are at issue, the development or resolution of which require the defendant's input," should be applied retroactively); Mitchell v. Moore, 786 So.2d 521, 529-531 (Fla.2001) (holding copy requirement of Florida's Prisoner Indigency Statute unconstitutional as a violation of a prisoner's right to access the courts, and applying Witt test to determine that new rule announced in case should be applied retroactively); State v. Stevens, 714 So.2d 347, 348 (Fla.1998) (holding that decision in State v. Iacovone, 660 So.2d 1371, 1374 (Fla.1995), which held that sections 784.07(3) and 775.0825, Florida Statutes (1991), only applied to attempted first-degree murder, should apply retroactively); State v. Gantorius, 708 So.2d 276, 277 (Fla. 1998) (acknowledged decision in Stevens, and held that decision in Iacovone, 660 So.2d at 1374, which held that mandatory minimum sentencing laws with respect to second and third-degree attempted murder were invalid, was to be applied retroactively); State v. Callaway, 658 So.2d 983, 987 (Fla.1995) (holding that decision in Hale v. State, 630 So.2d 521, 526 (Fla.1993), which held that trial courts could not impose consecutive habitual felony offender sentences for multiple offenses arising out of the same criminal episode, should apply retroactively), receded from on other grounds by Dixon v. State, 730 So.2d 265, 266 (Fla.1999); James v. State, 615 So.2d 668, 669 (Fla.1993) (holding that the United States Supreme Court's decision in Espinosa v. Florida, 505 U.S. 1079, 1082, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), which held that Florida's HAC instruction was unconstitutional, should be retroactively applied where James' counsel objected to the instruction at trial); Moreland v. State, 582 So.2d 618, 620 (Fla.1991) (holding that decision in Spencer v. State, 545 So.2d 1352, 1355 (Fla.1989), which held that administrative order that divided Palm Beach County into eastern and western jury districts resulted in the unconstitutional systematic exclusion of blacks from the eastern district's jury pool, should be applied retroactively); Jackson v. Dugger, 547 So.2d 1197, 1198-99 (Fla.1989) (holding that decision in Booth v. Maryland, 482 U.S. 496, 502-03, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which held that victim impact evidence is inadmissible in a capital sentencing proceeding, overruled by Payne v. Tennessee, 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), applied retroactively); Bass v. State, 530 So.2d 282, 283 (Fla.1988) (holding that ruling in Palmer v. State, 438 So.2d 1, 3 (Fla.1983), which held that the three-year minimum mandatory sentences prescribed by Florida Statutes could not be imposed consecutively for separate offenses arising from a single criminal transaction or episode, was to be applied retroactively); Thompson v. Dugger, 515 So.2d 173, 175 (Fla.1987) (concluding that Hitchcock v. Dugger, 481 U.S. 393, 398-99, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), which held that instruction to advisory jury to not consider nonstatutory mitigation, and trial judge's refusal to consider nonstatutory mitigation was improper, should be applied collaterally); Harvard v. State, 486 So.2d 537, 539 (Fla.1986) (holding that the United States Supreme Court's decision in Lockett v. Ohio, 438 U.S. 586, 608, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which held that the exclusion of nonstatutory mitigating evidence was unconstitutional, warranted retroactive application); State v. White, 470 So.2d 1377, 1379 (Fla.1985) (concluding that Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which held that the "imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed," is improper, should be applied collaterally); Tafero v. State, 459 So.2d 1034, 1035 (Fla.1984) (determining, under Witt, that Enmund is "such a change in the law as to be cognizable in postconviction proceedings"). See, e.g., the following cases decided before this Court's decision in Witt, in which this Court also applied a rule of law retroactively: Benyard v. Wainwright, 322 So.2d 473, 475 (Fla.1975) (holding that decision in Brumit v. Wainwright, 290 So.2d 39, 42 (Fla. 1974), which held that the Parole Commission may not delay the effective date of a parole revocation until the new sentence for the offense causing the revocation is completed, warranted retroactive application); State v. Statewright, 300 So.2d 674, 677 @ (Fla.1974) (acknowledging a limited retroactivity of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where defendant's interrogation occurred before Miranda, but the trial occurred afterwards); Ray v. State, 200 So.2d 529, 530 (Fla.1967) ("It becomes clear, therefore, under the retroactive application of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), that Ray is entitled to a new trial.").
[15] Our opinion in Witt cited approvingly to ABA standards as a primary source for the standard adopted in Witt:

This category of law changes was adapted from Section 2.1(a)(vi) of the ABA Standards Relating to Post-Conviction Remedies (Approv. Draft 1968), which provides in relevant part:
A post-conviction remedy ought to be sufficiently broad to provide relief (a) for meritorious claims challenging judgments of convictions, including claims:
. . . .
(vi) that there has been a significant change in law, whether substantive or procedural, applied in the process leading to applicant's conviction or sentence, where sufficient reasons exist to allow retroactive application of the changed legal standard.
Witt, 387 So.2d at 929 n. 25. As the majority concedes, this Court has long utilized the Witt test for determining when important changes in decisional law should be applied retroactively. See State v. Glenn, 558 So.2d 4, 6 (Fla.1990); McCuiston v. State, 534 So.2d 1144, 1146 (Fla.1988).
As noted above, however, while we have applied numerous important decisions retroactively under this analysis, the majority has chosen to ignore those decisions; it does not make even the slightest attempt to distinguish the significance of the issues involved in those cases from the important issue involved herein: the fundamental and constitutional right to a trial by jury. See supra note 14.
[16] For an extended discussion of why the restrictive Teague standard is inappropriate as a standard for retroactivity in state courts see my opinion in Hughes and the authorities discussed therein.
[17] Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).
[18] Indeed, perhaps the most notable case emanating from Florida that was given retroactive application was one that involved judicial process and the right to counsel during that process. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).
[19] The majority relies on out-of-context statements from Ring to bolster its analysis. For example, the majority cites language from Ring: "The Sixth Amendment jury trial right... does not turn on the relative rationality, fairness, or efficiency of potential factfinders." Ring, 536 U.S. at 607, 122 S.Ct. 2428. However, this statement from Ring does not support the assertion made by the majority. In fact, the Court was rejecting Arizona's argument that judicial fact-finding would lead to less arbitrary results than jury fact-finding. A more complete quote from Ring demonstrates the Court's meaning:

Arizona suggests that judicial authority over the finding of aggravating factors "may ... be a better way to guarantee against the arbitrary imposition of the death penalty." Tr. of Oral Arg. 32. The Sixth Amendment jury trial right, however, does not turn on the relative rationality, fairness, or efficiency of potential factfinders. Entrusting to a judge the finding of facts necessary to support a death sentence might be
"an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State.... The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free." Apprendi, 530 U.S., at 498, 120 S.Ct. 2348 (Scalia, J., concurring).
Ring, 536 U.S. at 607, 122 S.Ct. 2428. Hence, the quote in Ring of Justice Scalia's concurrence in Apprendi rejects the majority's attempt here to simply classify the issue as one of judicial procedure and efficiency.
[20] See supra note 14.
[21] While there was much confusion at the time as to why the United States Supreme Court refused to consider the Ring claims of Bottoson and King, it now appears, with the decision in Summerlin, that the Court would not consider any Ring claims in collateral proceedings.
[22] I also strongly disagree with the majority's implication that a finding of facts by the preponderance of the evidence by a professional judge is the equivalent of a jury finding facts beyond a reasonable doubt. Blakely's rejection of this implication is clear in noting that this characterization would fit much better in legal systems we have long ago rejected as alien to our vision of justice.

Indeed, it demeans the unique chemistry inherent in the constitutional guarantee of a right to trial by jury provided by our founding fathers in the first amendments to our constitution. That right includes the requirement that a jury composed of a citizen's peers apply the reasonable doubt standard. Notably, the United States Supreme Court has declared even before its pronouncements in Apprendi and Blakely:
The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence  that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."
In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Apprendi and Blakely add strength to this assessment.
However, contrary to this declaration, the majority's discussion trivializes the fundamental difference between the use of this standard in a trial by a professional judge and a trial by a jury of a citizen's peers. It also fails to consider the significance of the criminal burden of proof enforced by a jury sworn under oath, and the real possibility that the oath-bound citizen jurors may conclude that the State with all its power has not carried its burden of proof against a fellow citizen beyond a reasonable doubt. Consider the admonishment of Chief Justice John Fortescue in 1468 that a "jury of twelve citizens is the most powerful and efficient method for eliciting the truth." See J. Kendall Few, In Defense of Trial by Jury 27, American Jury Trial Foundation (1993).